UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTHONY GLENN,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 3:24-CR-107-KAC-JEM |

**ORDER ON REPORT AND RECOMMENDATION**

This criminal case is before the Court on Defendant Anthony Glenn's Objections [Doc. 57] to the Report and Recommendation ("Report") issued by United States Magistrate Judge Jill E. McCook [Doc. 50]. The Report recommends that the Court deny Defendant's Motion to Suppress [Doc. 32]. For the reasons below, the Court overrules Defendant's Objections to the Report and denies the Motion to Suppress.

## I. Background[1]

Around 1:30 a.m. on December 17, 2023, Officer Barnes of the Knoxville Police Department ("KPD") was patrolling an area of North Knoxville near "Central Street" [*See* Doc. 49 at 10-11 (Suppression Hearing Transcript)]. He often patrolled "that specific area" because there were "a lot of problems" with "drug[s] and traffic" [*Id.* at 30]. Officer Barnes "park[ed]" his car in "an empty lot that's directly across from the Super Wash," a local laundromat and car wash, and positioned his cruiser so that he could view the street in front of him [*Id.* at 34-35]. He left his car "running" [*Id.* at 35]. "[T]here wasn't a lot of traffic" [*Id.* at 14].

[1] The Court makes the following factual findings based on its review of the record and evidence from the suppression hearing [*See* Docs. 47, 48, 49].

Around 1:30 a.m., Officer Barnes "observed a black GMC Yukon going by" "at a high rate of speed, heading north on Central Street" [*Id.* at 11; *see also* Dash Camera Video 1[2]]. The vehicle was "unique"—it was "lifted" with a "specialty tag on the back" and "aftermarket rims" [*See* Doc. 49 at 14 (Suppression Hearing Transcript)]. Officer Barnes tried "to stop the car" and "initiated his lights" [*Id.*]. The vehicle "failed to yield" [*Id.* at 11]. So, Officer Barnes "initiated" his "sirens" [*Id.*]. The vehicle fled "at a high rate of speed" and "ran a stop sign" [*Id.*]. Per KPD policy, Officer Barnes "terminated the traffic stop and pulled to the side" of the road [*See* Docs. 49 at 11-12; 41 at 1 n.1 (explaining that KPD policy generally instructs Officers not to pursue a feeing vehicle within city limits)]. Officer Barnes gave a brief description of the vehicle to dispatch and "[s]tarted circulating the area" in an "[a]ttempt to locate the vehicle" [*See* Doc. 49 at 14 (Suppression Hearing Transcript)].

About five (5) minutes later, Officer Barnes "locat[ed]" what he believed to be the same vehicle traveling in the "same area" [*Id.*]. Specifically, he recognized "the specialty tag and the unique wheels and tires" [*Id.*]. Officer Barnes "initiated his blue lights" and attempted to traffic stop the vehicle [*Id.*]. Again, the vehicle did not stop [*See* Dash Camera Video 2[3]]. Eventually, the vehicle began to "slow roll," "continuing in the middle of the road going approximately two or three miles an hour" [*Id.* at 14-15 (Suppression Hearing Transcript)]. Based on Officer Barnes training and experience, "slow rolling" "raise[d] alarms" because it generally indicates that the driver is "looking for somewhere to run to or hide" [*Id.* at 53]. Because Officer Barnes thought

[2] The United States introduced Dash Camera Video 1 as United States Exhibit 1 at the suppression hearing [*See* Docs. 48, 49]. A copy is on file with the Court.
[3] The United States introduced Dash Camera Video 2 as United States Exhibit 2 at the suppression hearing [*See* Docs. 48, 49]. A copy is on file with the Court.

the vehicle, or its inhabitant(s), were preparing to flee, he radioed the license plate number to dispatch [*See* Dash Camera Video 2].

The vehicle eventually "stopped in the middle of the road" [*See* Doc. 49 at 15]. But the driver, later identified as Defendant, did not promptly place the "vehicle in park" [*Id.*]. Then, Defendant opened the driver's side door, threw his wallet onto the ground, and placed his hands out of the vehicle [*Id.*]. Officer Barnes instructed Defendant to "shut the car off" [*See* Dash Camera Video 2]. Defendant exited the vehicle with his hands raised [*Id.*]. Officer Barnes asked Defendant who else was in the car; there was no one [*Id.*; *see also* P. Barnes Body Camera Video[4]].

Officer Barnes approached with his service weapon drawn [*See* P. Barnes Body Camera Video]. He did this because Defendant exhibited "out of the normal" behavior so he was "unsure if" he "could have been armed" [*See* Doc. 49 at 16 (Suppression Hearing Transcript)]. Then, Defendant began to yell "I'm not on nothing, you don't gotta get pissy with me" [*See* P. Barnes Body Camera Video].

Officer Barnes approached Defendant, placed him in handcuffs, and explained to Defendant that he was detaining him because a vehicle matching his car's description "just ran" from Officer Barnes [*Id.*]. Defendant denied running, began to yell, and accused Officer Barnes of being "aggressive" [*Id.*]. Officer Barnes asked Defendant if he had any weapons on him, and Defendant replied: "Check me, man" [*Id.*]. Officer Barnes patted Defendant down and found three (3) cell phones in his left pocket [*Id.*]. Officer Barnes asked Defendant to sit on the hood of his cruiser; Defendant complied [*Id.*]. Defendant continued to act combative, telling Officer

[4] Defendant introduced the P. Barnes Body Camera Video as Defense Exhibit 7 at the suppression hearing [*See* Docs. 48, 49]. A copy is on file with the Court.

Barnes "don't put your hands on me" [*Id.*]. Defendant then admitted to speeding down Central Street and fleeing from Officer Barnes because he was "pissed off" and "wanted to go home" [*Id.*]. Defendant also insinuated he could have successfully evaded Officer Barnes, explaining: "I could have went right there and parked and you wouldn't have seen me" [*Id.*]. Unprompted, Defendant confessed to drinking but claimed he was not drunk [*Id.*]. Defendant explained that he was just going home and was "fucked up right now" [*Id.*]. Officer Barnes asked Defendant to "look at it from our perspective" [*Id.*]. And Defendant appeared to calm down, responding "I do, I do" [*Id.*]. Officer Barnes said, "when people act like" that "we don't know if the car is stolen, or what," and "we automatically think worst case scenario" [*Id.*]. Defendant calmly expressed "I understand, I understand" [*Id.*].

Officer Barnes initiated a records check on Defendant prior to issuing a ticket [*Id.*]. While awaiting the results, Officer Barnes asked Defendant if there was "anything illegal in the car" [*Id.*]. And Defendant stomped his foot, again exasperated, and said: "Man, check the car if you want to" [*Id.*]. Officer Barnes walked over to the vehicle [*Id.*]. Defendant yelled: "But what I'm saying is, when you check the car, and there ain't nothing in it, there's nothing you can do to me. There's no weed smoke in there for one, for my vehicle to be searched like that. I know my rights" [*Id.*]. Officer Barnes explained that he was only "asking" for "consent" to search Defendant's vehicle, and that Defendant could say no [*Id.*]. Defendant replied: "Right now, I'm not gonna let you search my car" [*Id.*]. Again unprompted, Defendant admitted to "run[ning] a stop sign" and expressed that he believed this was only a "traffic stop," "nothing other than that," "no drug stop suspicious or nothing" [*Id.*]. According to Defendant, "You [Officer Barnes] was behind me, I ran the stop sign, that's what you blue lighted me for" [*Id.*]. Officer Barnes explained that he "blue

lighted" Defendant "for speeding" and Defendant "did not stop" [*Id.*]. Defendant exclaimed "you [Officer Barnes] also did what you did!" [*Id.*]. Officer Barnes told Defendant that he was "not trying to take" Defendant "to jail on a traffic charge" [*Id.*]. But Officer Barnes reminded Defendant: "You realize running from the police could be a felony" [*Id.*]. Defendant responded: "I know my rights, it could be a felony, but you don't smell no weed coming out of that car or nothing" [*Id.*].

At this point, dispatch completed Defendant's record check. Officer Barnes learned that Defendant had a lengthy criminal history; including convictions for aggravated assault, domestic assault, evading arrest, criminal trespass, disorderly conduct, driving without a license, driving under the influence, aggravated robbery; and perhaps most importantly, manufacture, deliver, sell, possession of Schedule II controlled substance [*Id.*]. The vehicle was registered to Defendant and his registration was current [*Id.*].

After receiving the results, Officer Barnes exited his cruiser and approached Defendant. Now calm, Defendant blurted out: "Now, when you ran my license, clean." [*Id.*]. Officer Barns responded: "But you still have a pretty lengthy criminal history . . . with everything that's adding up, I want to make sure nothing is in the car" [*Id.*]. Defendant responded: "What came back on me is drugs. That's what I went to jail for. I did my prison time for that. I don't sell drugs anymore" [*Id.*].

Officer Barnes again asked to search the vehicle [*Id.*]. Defendant responded, "if you check my car and there's no marijuana smell in there, that's against my rights" [*Id.*]. Officer Barnes explained he could search the car with consent or "probable cause" [*Id.*]. But Defendant believed that Officer Barnes was "going off of my history" [*Id.*]. Officer Barnes explained that he "was

going off" Defendant's "history," "the fact that" Defendant "fled" from Officer Barnes, and "the behavior and patterns" Defendant was "exhibiting;" "all that's adding up" [*Id.*]. Defendant responded: "You're right, you're right. I'm not saying you're wrong, you're right" [*Id.*]. And Defendant consented to a search [*Id.*]. Then, he revoked his consent [*Id.*]. Defendant explained that, in his opinion, the car did not smell like marijuana, so Officer Barnes could not search it [*Id.*].

Officer Barnes called for a drug dog [*Id.*]. At this time, Defendant's wife appeared on the scene [*Id.*]. Defendant consented to a search again, then revoked it [*Id.*]. Officer Barnes waited for the drug dog [*Id.*]. Defendant asked what he was going to jail for, and Officer Barnes again indicated that it was not his intent to take Defendant to jail [*Id.*]. For several minutes, Defendant and his wife both yelled at Officer Barnes [*Id.*]. Defendant's stepson then appeared on the scene [*Id.*]. Defendant continued to yell at Officer Barnes [*Id.*]. Then, Defendant appeared to calm down and explained he was not "trying to be disrespectful;" he asked Officer Barned to "be honest" and explain what he was trying to do [*Id.*]. Officer Barnes explained that if the drug dog did not alert on the vehicle, he would issue Defendant a "few tickets" and he could go home [*Id.*].

Upon arrival, the drug dog quickly alerted on the vehicle [*Id.*]. Officer Barnes conducted a search [*Id.*]. First, Officer Barnes located an empty magazine under the driver's seat [*Id.*]. Then, he noticed that the center cupholder console appeared loose [*Id.*]. He wiggled it out of place, revealing a false bottom [*Id.*]. Inside was a stolen Glock 19X 9mm pistol and a loaded magazine [*Id.*]. There was also marijuana residue [*Id.*]. Officer Barnes arrested Defendant and towed Defendant's vehicle [*Id.*].

On September 18, 2024, the Grand Jury indicted Defendant for unlawfully possessing a firearm and ammunition as a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1) [*See* Doc.

3 at 1]. Defendant moved to suppress "statements made by Defendant" during the stop and "all physical evidence recovered from his vehicle" [*See* Doc. 32 at 1, 8]. After a hearing, [*see* Doc. 47], Judge McCook issued a Report, recommending that the Court deny the Motion, [*see* Doc. 50]. Defendant objected, arguing in relevant part that (1) Officer Barnes did not have probable cause, or reasonable suspicion, to initiate the traffic stop, (2) Officer Barnes unlawfully prolonged the stop, and (3) Defendant was entitled to *Miranda* warnings during the stop, so Defendant's statements made during the stop should be suppressed[5] [*See* Doc. 57 at 6-19]. The United States responded [*See* Doc. 58].

## II. Analysis

Under 28 U.S.C. § 636(b)(1), "[a] judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If a Party makes a timely objection under Section 636(b)(1) and that objection is not "frivolous, conclusive[,] or general," *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986), "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which [the] objection is made," 28 U.S.C. § 636(b)(1); Fed. R. Crim P. 59(b)(3) ("district judge must consider de novo any objection to the magistrate judge's recommendation"). However, the Court need not engage in de novo review of undisputed portions

[5] Defendant previously argued that the physical evidence, including a firearm and ammunition, discovered during the search should also be suppressed based on the purported *Miranda* violation [*See* Doc. 50 at 46]. But Defendant did not object to the Report's rejection of this argument [*See* Doc. 57 at 19 (arguing only that "Defendant's statements made during his arrest should be suppressed" based on the purported *Miranda* violation)]. And to the extent he intended to do so, that objection would fail under the facts and law here. *See United States v. Patane*, 542 U.S. 630, 634, 642 (2004) (concluding that the "Self-Incrimination clause," which "the *Miranda* rule protects," "is not implicated by the introduction at trial of physical evidence resulting from voluntary statements").

of the Report. *See Mira*, 806 F.2d at 637.

"It is well settled that a police officer may conduct a traffic stop when the officer has probable cause to believe that a traffic violation has occurred." *United States v. Watson*, 142 F.4th 872, 877 (6th Cir. 2025). Probable cause exists when "the facts and circumstances within the officer's knowledge" "are sufficient to warrant a prudent man in believing that the individual had committed or was committing an offense." *See id.* at 877-78 (cleaned up). Here, Officer Barnes had probable cause to stop Defendant. Around 1:30 a.m., a unique black vehicle with a lift and specialty plate drove past Officer Barnes at a high rate of speed [*See* Dash Camera Video 1]. Officer Barnes initiated his blue lights and siren and the vehicle fled, running a stop sign [*See* Doc. 49 at 11 (Suppression Hearing Transcript)]. Under Tennessee law, it is generally unlawful to run a stop sign, *see* Tenn. Code. Ann. §55-8-149(c), and flee after an officer has given a "signal" "to bring the vehicle to a stop," *see id.* at § 39-16-603(b).

Officer Barnes stopped perusing the vehicle per KPD policy [*Id.*; *see also* Doc. 41 at 1 n.1]. But he continued to circle the immediate area after 1:00 a.m. looking for the vehicle [*See* Doc. 49 at 14 (Suppression Hearing Transcript)]. Five (5) minutes later, he located what he believed, and Defendant later confirmed, to be the same, unique black vehicle, adorned with a lift and specialty plate [*Id.*]. Based on these facts, Officer Barnes had probable cause to initiate a traffic stop of that vehicle. *See Watson*, 142 F.4th at 877-78. So, the seizure was "lawful at its inception." *See United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022).

Nonetheless, if an officer "prolong[s]" a traffic stop "beyond the time reasonably required to complete the mission of issuing" "a ticket," the officer must have reasonable suspicion. *See id.* at 529 (cleaned up) (explaining that without reasonable suspicion, an officer may conduct

"ordinary inquiries incident to the traffic stop, such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"). Above all, reasonable suspicion is a "commonsense inquiry." *See United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024) (cleaned up). Reasonable suspicion exists "when an officer has specific articulable facts that provide an objective basis for suspecting legal wrongdoing." *See id.* (cleaned up). Courts adhere to certain basic principles when assessing whether an officer has reasonable suspicion. *See id.* at 719. First, "innocent activity can form the basis for reasonable suspicion." *Id.* Second, the Court may not engage in a "divide and conquer" analysis and "must consider the relevant facts collectively." *Id.* Third, "law enforcement may rely on criminal 'profiles' when choosing to" "extend an investigative detention." *Id.*

At the time Officer Barnes decided to call for a drug dog, he needed reasonable, articulable suspicion that Defendant was engaged in criminal activity to lawfully prolong the traffic stop. *See Whitley*, 34 F.4th at 529-32 (explaining that an officer must have reasonable suspicion to conduct a dog sniff when the "sniff prolongs—i.e., adds time to—the stop" (quoting *Rodriguez v. United States*, 575 U.S. 348, 357 (2015))). Taken as a whole, the relevant facts here clear this relatively "low" "bar." *See United States v. Williams*, 68 F.4th 304, 308 (6th Cir. 2023).

***First***, Officer Barnes was patrolling, late at night, in an area that experienced "drug" "problems" [*See* Doc. 49 at 30 (Suppression Hearing Transcript)]. Travel in an area "known" "for drug trafficking" is "relevant to the overall reasonable suspicion inquiry." *See Williams*, 68 F.4th at 308. As is the "late-night" encounter. *See District of Columbia v. R.W.*, 608 U.S. 22, 26 (2026); *United States v. Ledbetter*, 929 F.3d 338, 347 (6th Cir. 2019) ("[I]t is relevant that the stop occurred at night in a high-crime area.").

***Second***, when Officer Barnes initially attempted to pull Defendant over for speeding, Defendant fled and ran a stop sign [*See* Doc. 49 at 11 (Suppression Hearing Transcript); *see also* Dash Camera Video 1]. "[F]light upon noticing the police is certainly suggestive of wrongdoing." *See R.W.*, 608 U.S. at 26 (cleaned up). Then, approximately five (5) minutes later, Officer Barnes attempted to pull Defendant over again [*See* Doc. 49 at 14-15, 53; Dash Camera Video 2]. This time, Defendant was hesitant to pull over and "slow roll[ed]" [*See id.*]. This "raise[d] alarms" based on Officer Barnes's training and experience because it generally indicates that the driver is "looking for somewhere to run to or hide" [*See* Doc. 49 at 53]. When Defendant did finally stop, he stopped in the middle of the road and did not immediately place the car in park [*See id.*]. Under these circumstances, Defendant's failure to "immediately stop after the officer[] activated [his] lights and siren" was a "huge red flag." *See Ledbetter*, 929 F.3d at 347.

***Third***, Defendant exhibited abnormal, "suspicious behaviors" throughout the duration of the stop. *See Jordan*, 100 F.4th at 720. Before being asked, Defendant opened his door, held his arms out, dropped his wallet in the middle of the street, and exited his vehicle [*See* Dash Camera Video 2, P. Barnes Body Camera Video]. This behavior was so abnormal to Officer Barnes that he brandished his service weapon, fearing Defendant was armed [*See id.*, Doc. 49 at 16 (Suppression Hearing Transcript)]. Defendant continued to exhibit aggressive behavior; he raised his voice at Officer Barnes and yelled about how he was "pissed off" [*See* P. Barnes Body Camera Video]. Throughout the encounter, Defendant would appear cooperative, then become uncooperative [*See id.*]. For example, he consented to a search then revoked consent multiple times [*Id.*]. And Defendant went back and forth between yelling at Officer Barnes and seeming to understand Officer Barnes's position [*Id.*]. Defendant's erratic behavior contributed to Officer

Barnes's reasonable suspicion. *See United States v. Hoover*, 179 F.4th 454, 467 (6th Cir. 2026) (noting that, in combination with other factors, "changes in" an individual's behavior that are "all over the place," such as switching from "questioning to apologetic to questioning to apologetic," can support reasonable suspicion "of drugs in the vehicle").

***Fourth***, Defendant lied to Officer Barnes. For example, Officer Barnes explained to Defendant that he pulled Defendant over because his vehicle matched the description of the vehicle that fled from Officer Barnes five (5) minutes earlier [*See* P. Barnes Body Camera Video]. But Defendant fervently denied fleeing, only to admit minutes later that he did, in fact, attempt to evade Officer Barnes because he "wanted to go home" [*See id.*]. Defendant's decision to lie to Officer Barnes added to Officer Barnes's suspicion. *See Jordan*, 100 F.4th at 721 (noting that "lying" can help "form" an officer's "basis for reasonable suspicion"); *United States v. Atchley*, 474 F.3d 840, 848-49 (6th Cir. 2007) (explaining that "lying" about something as simple as "renting the [hotel] room" rightfully raises an officer's "level of suspicion"); *United States v. Winters*, 782 F.3d 289, 299-300 (6th Cir. 2015) (collecting cases). And Defendant's response was incongruent—if Defendant fled from Officer Barnes because he "wanted to go home," why was Defendant still out on the road five (5) minutes later in the same area where Officer Barnes first saw the vehicle [*See* P. Barnes Body Camera Video]?

***Fifth***, Defendant exhibited indicia of a drug trafficking profile. *See Jordan*, 100 F.4th at 719. "When criminals commonly use certain 'modes or patterns of operation,' officers may be reasonably suspicious of individuals whose behavior fits those patterns." *Id.* After exiting his vehicle without being told to do so, Defendant yelled: "I'm not on nothing" [*See* P. Barnes Body Camera Video]. A few moments later, unprompted, Defendant admitted that he had been drinking.

And Defendant, on his own volition, continually brought up "weed," "marijuana," and "drugs" [*Id.*]. *See Nykoriak v. Wileczek*, 666 F. App'x 441, 444 (6th Cir. 2016) (appearing to "be under the influence" of drugs may supply reasonable suspicion). Then, when Defendant consented to a frisk of his person, Officer Barnes located three (3) phones in Defendant's pocket [*See* P. Barnes Body Camera Video]. "[M]ultiple cell phones are often found in the possession of people engaged in drug activity." *See Nykoriak*, 666 F. App'x at 444.

***Finally***, Defendant's records revealed a lengthy criminal history, including violent offenses and at least one controlled substance offense [*See* P. Barnes Body Camera Video]. And for his part, Defendant voluntarily confessed that he used to sell drugs and that he went to prison for selling drugs [*Id.*]. Criminal history "reports" that are "specific and related to the same suspicions that the officer was developing" "may justify further detention" and "may cast a suspicious light on other seemingly innocent behavior." *See United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012). Here, in combination with the other factors discussed above, Defendant's on-point criminal history "casts a suspicious light on the otherwise weaker indicators." *Id.*

"[W]hen it comes to reasonable suspicion, the whole is usually greater than the sum of its parts." *See Jordan*, 100 F.4th at 719. Taken together, (1) the high-drug-crime area and late hour, (2) Defendant's flight and evasive tactics, (3) Defendant's erratic and suspicious behavior, (4) Defendant's lie to Officer Barnes, (5) indicia of potential drug trafficking, and (6) Defendant's drug-related criminal history combine to create reasonable suspicion that Defendant was engaged in drug-related criminal activity. Because Officer Barnes had "separate reasonable suspicion of criminal activity," he did not violate Defendant's Fourth Amendment rights when he prolonged the stop to wait for the drug dog. *See Stepp*, 680 F.3d at 667.

Defendant also argues that Officer Barnes violated his Fifth Amendment rights because Officer Barnes did not Mirandize Defendant during the stop. *Miranda v. Arizona* does not apply to every interaction with law enforcement. In *Miranda*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" unless the defendant has been apprised of his constitutional right against self-incrimination and waived that right. *See* 384 U.S. 436, 444 (1966).

Here, Defendant may not have been "in custody" for purposes of *Miranda*. *See, e.g.*, *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003). "Even if a reasonable person in a suspect's position would not have felt free to leave, the suspect is not in custody" for the purposes of *Miranda* "unless the relevant environment presents the same inherently coercive pressures as" "station house questioning." *See United States v. Howard*, 815 F. App'x 69, 79 (6th Cir. 2020) (cleaned up). "The temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not" ordinarily "constitute *Miranda* custody." *See id.* (cleaned up). Here, the investigative detention took place in a public space, and Defendant's wife and stepson were present for much of it [*See* P. Barnes Body Camera Video]. Officer Barnes did not ask Defendant many questions; he instead mainly waited for the drug dog to confirm or dispel his suspicions [*See id.*]. The questions Officer Barnes did ask were generally conversational in tone [*See id.*]. Routine "follow-up" questions "supported by reasonable suspicion" do not transform a traffic stop into a "custodial interrogation" for purposes of *Miranda*. *See United States v. Dunn*, No. 23-5058, 2023 WL 8114366, at *6 (6th Cir. Nov. 22, 2023). And Officer Barnes repeatedly reminded Defendant that he was not under arrest and that it was not his intent to take Defendant to jail [*See* P. Barnes Body Camera Video]. True, Officer Barnes placed Defendant in hand cuffs for officer safety; but

Officer Barnes allowed Defendant to sit on the hood of his police cruiser during the interaction [*See id.*]. On balance, Defendant may not have been "in custody." *See Swanson*, 341 F.3d at 529.

And even if Defendant were in custody, Officer Barnes did not interrogate Defendant for the purposes of *Miranda*. "*Miranda* only governs "interrogations."" *See United States v. Lester*, 98 F.4th 768, 773 (6th Cir. 2024) (citation omitted). "Interrogation, as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond what is inherent in custody itself." *See United States v. Thomas*, 381 F. App'x 495, 501 (6th Cir. 2010). And "any statement given freely and voluntarily without any compelling influences is" "admissible in evidence." *See id.* at 502 (cleaned up). Defendant offers no evidence that his statements were "involuntary," beyond the assertion that he was in custody. *See United States v. Reese*, 509 F. App'x 494, 500-01 (6th Cir. 2012). So, *Miranda* would not require suppression of Defendant's statements.

**III. Conclusion**

For the reasons above, the Court **ADOPTS** the unchallenged portions of the Report [Doc. 50], **OVERRULES** Defendant's Objections to the Report [Doc. 57], and **DENIES** the Motion to Suppress [Doc. 32].

SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge